**MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.**
Steven J. Greenfogel
Daniel B. Allanoff (DA-1664)
117 South Seventeenth Street, Suite 2200
Philadelphia, PA 19103
Telephone: (215) 564-5182
Facsimile: (215) 269-0958

RECEIVED-CLERK
U.S. DISTRICT COURT

2005 FEB 23 ⏐⊃ 3: 39

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

GOLDEN GATE BRIDGE, HIGHWAY AND )
TRANSPORTATION DISTRICT, on behalf of )
itself and all others similarly situated, )
                                )
        Plaintiff, )
                                )
    vs. )
                                )
MARSH & MCLENNAN COMPANIES, )
INC.; MARSH INC.; AON CORPORATION; )
AON BROKERS SERVICES, INC.; AON )
RISK SERVICES COMPANIES, INC.; AON )
RISK SERVICES INC. U.S.; AON GROUP, )
INC.; AON SERVICES GROUP, INC.; )
WILLIS GROUP HOLDINGS LTD.; WILLIS )
GROUP LTD.; WILLIS NORTH AMERICA, )
INC.; UNIVERSAL LIFE RESOURCES dba )
ULR; UNIVERSAL LIFE RESOURCES, INC. )
dba ULR INSURANCE SERVICES, INC.; )
BENEFITS COMMERCE; DOUGLAS P. )
COX; ARTHUR J. GALLAGHER & CO.; )
ACE LIMITED; ACE INA HOLDINGS, INC.; )
ACE INA; ACE USA; AMERICAN )
INTERNATIONAL GROUP, INC.; )
HARTFORD FINANCIAL SERVICES )
GROUP, INC.; MUNICH AMERICAN RISK )
PARTNERS, INC.; AMERICA RE- )
INSURANCE CO.; MUNICH )
REINSURANCE CO.; METLIFE, INC.; )
UNUMPROVIDENT CORPORATION; ST. )
PAUL TRAVELERS COS., INC.; ZURICH )
AMERICAN INSURANCE CO. dba ZURICH )
NORTH AMERICA; and NATIONAL )
FINANCIAL PARTNERS CORPORATION, )
                                )
        Defendants. )

Case No.     *05-1214*
                *C F S H)*

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SHERMAN
ACT, RICO, STATE ANTITRUST AND
UNFAIR COMPETITION LAWS, FOR
BREACHES OF FIDUCIARY DUTIES,
AND FOR UNJUST ENRICHMENT**

**(JURY TRIAL DEMANDED)**

I. **INTRODUCTION.**

1. This is an action for treble damages and injunctive relief brought under Section 1 of the Sherman Act (15 U.S.C. §1), the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §1961 *et seq.*), under the laws of the various states that prohibit antitrust violations and unfair and/or deceptive trade practices and for breaches of fiduciary duty and unjust enrichment. Plaintiff Golden Gate Bridge, Highway and Transportation District ("Plaintiff") alleges that the Insurance Broker Defendants (as that term is defined below) conspired with each other and with the Insurer Defendants (as that term is defined below) to allocate brokerage customers and rig bids for Insurance Products (as that term is defined below) offered to those customers. These practices violate federal and state laws. Because brokerage clients were misled and deceived about these practices, as well as the use of kickback schemes between the Insurance Broker Defendants and the Insurer Defendants, both sets of defendants also engaged in conduct that violates various state laws prohibiting unfair and/or deceptive trade practices. Plaintiff brings this lawsuit as a class action on behalf of all clients of the Insurance Broker Defendants who bought Insurance Products, where the sales of those products were subject to the commission, bid-rigging, and customer allocation agreements described herein from at least January 1, 1994 to the present. Plaintiff respectfully demands a trial by jury and complains and alleges on information and belief as follows.

II. **JURISDICTION AND VENUE.**

2. The claims in this complaint are brought under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26), and 18 U.S.C. §§1961, 1962 and 1964, to recover treble damages and costs of suit, including reasonable attorneys' fees, against defendants for the injuries sustained by Plaintiff and the members of the proposed class by reason of the violations of Section 1 of the Sherman Act (15 U.S.C. §1) and violations of 18 U.S.C. §§1962(c) and (d) as alleged herein.

3. The claims in this complaint are also brought under state laws prohibiting antitrust violations and unfair and/or deceptive business practices. Restitutionary relief,

including disgorgement of profits, is sought for such violations.  Where applicable, damage remedies (including treble damage remedies) are also sought.

4.    In addition, this action is instituted to secure injunctive relief against defendants to prevent them from further violating Section 1 of the Sherman Act and state laws as alleged in this complaint.

5.    Jurisdiction is conferred upon this Court by 28 U.S.C. §1331, §1337, by Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26), by 18 U.S.C. §§1964(a) and (c) and 1965, and by 28 U.S.C. §1367.

6.    Venue is proper in this judicial district pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§15, 22 and 26), and 28 U.S.C. §1391(b), (c), and (d).

7.    Defendants maintain offices, have agents, transact business, or are found within this judicial district.  Plaintiff's claims alleged in this complaint arise in part within this district.  The interstate trade and commerce described herein is and has been carried out in part within this district.  Defendants have provided services and products in the stream of commerce that have reached this district.

### III.   PARTIES

8.    Plaintiff Golden Gate Bridge, Highway and Transportation District is a multi-county political subdivision of the State of California based in the city and county of San Francisco.  It operates the Golden Gate Bridge and two public transit systems:  the Golden Gate Transit bus system and the Golden Gate Ferry.  Plaintiff has purchased Insurance Products (as defined herein) from one or more of the Insurance Broker Defendants (as defined herein) during the Class Period (as defined herein).

9.    Defendant Marsh & McLennan, Inc. ("MMC") is a Delaware corporation having its principal place of business at 1166 Avenue of the Americas, New York, New York 10036-2774.  MMC provides risk and insurance services to its customers through its subsidiaries as broker, agent or consultant for insureds, insurance underwriters or other

brokers.  MMC is the largest provider of insurance brokering and consulting services in the world.

10.     Defendant Marsh, Inc. is a wholly-owned subsidiary of MMC that has its principal place of business at 1166 Avenue of the Americas, New York, New York 10036-2774.  Marsh claims at its website that it is "the world's leading risk and insurance services firm," with 410 owned and operated offices in 100 countries employing 42,000 people.  Marsh provides, *inter alia*, insurance brokering services; its annual revenues in 2003 were $6.9 billion.  Any action alleged herein that was undertaken by Marsh was undertaken with the knowledge and approval of its parent, MMC.

11.     Defendant Aon Corporation is a Delaware company that has its principal place of business at 200 E. Randolph St., Chicago, Illinois 60601.  Aon Corporation provides risk and insurance brokerage services through its subsidiaries to its clients and is the second largest insurance broker behind MMC; together Marsh and Aon control about 70 percent of the domestic corporate insurance market.  It has 37,000 employees worldwide.  Aon Corporation reported earning $1.5 billion on its risk and insurance brokerage services in 2003.  Among the subsidiaries through which Aon Corporation operates are:  defendants Aon Brokers Services Inc.; Aon Risk Services Companies, Inc.; Aon Risk Services Inc. U.S.; Aon Group, Inc.; and Aon Services Group, Inc.  Any action undertaken by any of Aon Corporation's subsidiaries related to the matters described herein were undertaken with the knowledge and approval of Aon Corporation.  For the purposes of this complaint, the term "Aon" refers collectively to Aon Corporation and its subsidiaries.

12.     Defendant Willis Group Holdings, Ltd. ("WGHL") is a Bermudan corporation the shares of which are listed and traded on the New York Stock Exchange with its principal place of business at Ten Trinity Square, London EC3P 3AX, England.  It provides insurance brokerage and related services in the United States through various subsidiaries that have more than 80 offices located in 35 states.  Among those subsidiaries are defendants Willis Group Ltd. (a private limited company registered in both England and Wales with its corporate

headquarters at the address listed above) and Willis North America, Inc. (a Delaware company with its corporate headquarters in New York, New York). Any action undertaken by any of WGHL's subsidiaries related to the matters described herein was undertaken with the knowledge and approval of WGHL. For the purposes of this complaint, the term "Willis" refers collectively to WGHL and its subsidiaries.

13.    Defendant Universal Life Resources dba ULR is a California limited partnership having its principal place of business at 12264 El Camino Real, Suite 303, San Diego, California. It is a national group life, accident and disability consulting company that works with insurers to design and broker life, accident and disability programs. Its general partner is defendant Universal Life Resources, Inc. dba ULR Insurance Services, Inc. and it has regional offices in five states. For the purposes of this complaint, the term "ULR" refers to both of these entities.

14.    Defendant Douglas P. Cox ("Cox") is President and CEO of ULR and is the sole shareholder of Defendant Benefits Commerce, an entity that has been used in ULR's unlawful conduct, as described below. Cox controls ULR and treats the ULR entities as his personal instrumentalities.

15.    Defendant Arthur J. Gallagher & Company ("Gallagher") is the fourth largest insurance broker in the United States. It is a Delaware corporation having its principal place of business at Two Pierce Place, Itasca, Illinois. Gallagher operates through a network of more than 250 sales and service offices located throughout the United States and eight countries abroad. Its brokerage segment comprises three operating divisions: the Brokerage Services—Retail Division, the Special Marketing & International Division, and the Gallagher Benefit Services Division.

16.    Defendant ACE Limited ("ACE Ltd.") is a Cayman Islands corporation having its global headquarters at 17 Woodbourne Avenue, Hamilton HM08, Bermuda. Marsh played a leading role in creating ACE Ltd. in 1985. ACE Ltd. is the holding company for the ACE Group of Companies, also incorporated in the Cayman Islands. Through its subsidiaries,

ACE Ltd. provides property, casualty, accident and health insurance. ACE Ltd. is the owner of defendant ACE INA Holdings, Inc.

17.     Defendant ACE USA is one of the companies held by ACE Ltd. and comprises the U.S. and Canadian operations of defendant ACE INA and ACE Westchester. Its principal place of business is at Two Liberty Place, 1101 Chestnut Street, Philadelphia, Pennsylvania 19103. Any action alleged herein that was undertaken by ACE USA or any of its subsidiaries was undertaken with the knowledge and approval of ACE Ltd.

18.     Defendant American International Group, Inc. ("AIG") is a Delaware company with its principal place of business at 70 Pine Street, New York, New York 10270. Through its subsidiaries, it provides, *inter alia,* general, property casualty, and life insurance products.

19.     Defendant Hartford Financial Services Group Inc. ("Hartford") is a Delaware company having its principal place of business at Hartford Plaza, Hartford, Connecticut 06115-1900. It is among the largest providers of individual life, group life and disability, and property casualty insurance products in the United States.

20.     Defendant Munich-America Risk Partners, Inc. ("MARP") is a division of defendant American Reinsurance Co. ("Amre"), which is, in turn, a wholly-owned subsidiary of defendant Munich Reinsurance Co. ("Munich Re"). MARP provides risk transfer and sharing and risk management solutions to what it calls on its website non-traditional reinsurance clients. Its risks are underwritten by Amre and other members of the Munich Re Group. Amre has its principal place of business at 555 College Road East, Princeton, New Jersey 08543. Munich Re's headquarters is located at Konigstrasse 107, 80802 München, Germany. Any actions alleged herein to have been undertaken by MARP were done with the knowledge and approval of its parents, Amre and Munich Re.

21.     Defendant National Financial Partners Corp. ("NFP") is a leading distributor of financial service products and operates a national distribution network of over

1,500 producers in 40 states and Puerto Rico. Its national headquarters is located at 787 Seventh Avenue, 49th Floor, New York, New York 10019.

22.     Defendant MetLife, Inc. ("MetLife") is a Delaware corporation having its principal place of business at One Madison Avenue, New York, New York 10010-3690. MetLife is one of the leading providers of insurance and other financial services in the United States. In 2003, the company earned $9 billion in revenues and fees.

23.     Defendant UnumProvident Corporation ("UnumProvident") is a Delaware company having its principal place of business at 1 Fountain Square, Chattanooga, Tennessee 37402. Unum Provident is the parent entity for, *inter alia*, a group of insurance companies, including Unum Life Insurance Co. of America, Provident Life and Accident Insurance Co., The Paul Revere Life Insurance Co. and Colonial Life & Accident Insurance Co.

24.     Defendant St. Paul Travelers Cos., Inc. ("St. Paul") is a Minnesota corporation having its principal place of business at 385 Washington St., St. Paul, MN 55102. Through various subsidiaries, St. Paul provides numerous lines of property and liability insurance.

25.     Defendant Zurich American Insurance Co. dba Zurich North America ("ZNA") is an insurer that has its principal place of business at 100 American Lane, Schaumburg, IL 60196. It provides personal, life and automobile insurance to businesses and its business units include Centre Insurance, Empire Insurance, Universal Underwriters Group, Zurich Corporate Solutions, ZNA's Specialty Excess Casualty Unit and Zurich Global Energy. Any action alleged herein that was undertaken by any of those subsidiaries was undertaken with the knowledge and approval of ZNA.

## IV.   DEFINITIONS.

26.     For the purposes of this complaint, MMC, Marsh, ULR, Benefits Commerce, Cox, Aon (including its subsidiaries), Gallagher and Willis (including its subsidiaries) are referred to collectively as the "Insurance Broker Defendants." ACE Ltd. and

its subsidiaries sued herein, ZNA, MetLife, NFP, AIG, Hartford, UnumProvident, MARP, Amre, Munich Re, and St. Paul are referred to collectively as the "Insurer Defendants."

27.    For the purposes of this complaint, the Insurer Defendants and the Insurance Broker Defendants will be referred to collectively as "Defendants."

28.    For the purposes of this complaint, the term "Insurance Products" consists of commercial general liability insurance, property and casualty insurance, excess property or casualty or liability insurance, health insurance, surplus lines insurance, personal life and accident insurance, and reinsurance.

29.    For the purposes of this complaint, the term "contingent commission agreement" refers to an agreement whereby insurers pay sums to insurance brokerage companies to obtain business from the latter.  The precise terms of these agreements vary, but they commonly require the insurance company to pay the broker based on one or more of the following:  (a) how much business the broker's clients place with the insurance company; (b) how many of the broker's clients renew policies with the insurance company; and (c) the profitability of the business placed by the broker.

30.    The Insurance Broker Defendants have various names for the contingent commission arrangements into which they enter with insurers.  Marsh calls them "Market Services Agreements" ("MSAs") and asserts that they are based primarily, but not exclusively, on premium volume or growth.  Previously, Marsh used to refer to these agreements as "Placement Service Agreements" ("PSAs").  Willis has indicated that contingent commission arrangements encompass compensation based on premium volume transacted with an insurer and compensation based on the profit performance of business transacted with an insurer.  Aon refers to contingent commission arrangements as "Compensation for Services to Underwriters" agreements, or "CSUs".

## V.   CLASS ACTION ALLEGATIONS.

31.   Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following class:

> All persons and entities (excluding Defendants, their subsidiaries and affiliates, and their co-conspirators) who retained the services of any Insurance Broker Defendant for the procurement or renewal of Insurance Products and subsequently purchased any Insurance Products from one or more of the Insurer Defendants at any time during the period from January 1, 1994 to the present (the "Class").

32.   Plaintiff does not know the exact size of the Class because such information is in the exclusive control of the Defendants. Nevertheless, there are potentially millions of class members dispersed throughout the United States. Due to the nature of the trade and commerce involved, Plaintiff believes that the Class members are so numerous that joinder of all Class members in this action is impracticable.

33.   Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all Class members are all direct purchasers of Insurance Products who paid artificially inflated prices for those products due to Defendants' contract, conspiracy or combination alleged herein.

34.   Plaintiff will fairly and adequately protect the interests of the Class as the interests of Plaintiff are coincident with, and not antagonistic to, those of the Class. In addition, Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation.

35.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

36.   Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members. Defendants have acted

on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

     a.    whether Defendants and their co-conspirators engaged in a contract, conspiracy or combination to fix prices of, rig bids for, or allocate customers of Insurance Products sold in the United States;

     b.    whether the alleged contract, conspiracy or combination violated (i) Section 1 of the Sherman Act, (ii) 18 U.S.C. §§1962(c) and(d), and/or (iii) the state laws identified herein;

     c.    whether defendants' conduct gives rise to claims for breaches of fiduciary duties and for unjust enrichment;

     d.    the duration and extent of the contract, conspiracy or combination alleged herein;

     e.    whether the Defendants and their co-conspirators took affirmative steps to conceal the contract, conspiracy or combination;

     f.    whether each of the Defendants was a participant in the contract, conspiracy or combination alleged herein;

     g.    whether the Defendants' conduct caused the prices of Insurance Products to be set at an artificially high and supra-competitive level;

     h.    the effect of Defendants' contract, conspiracy or combination upon interstate commerce;

     i.    the appropriate measure of damages; and

     j.    whether Plaintiff and Class members are entitled to declaratory and/or injunctive relief.

     37.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein.  Such treatment will permit a large number of similarly situated public/governmental entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense

that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The Class is readily ascertainable from the Defendants' records.

38.     Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole. Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

## VI.     TRADE AND COMMERCE AFFECTED.

39.     Beginning at least as early as January 1, 1994, and continuing until the present, the exact dates unknown to Plaintiff at this time, Defendants engaged in continuing contract, conspiracy or combination in restraint of trade in violation of the Sherman Act.

40.     During the Class Period herein alleged, the Insurer Defendants sold, and the Insurance Broker Defendants brokered the sales of, substantial quantities of Insurance Products in a continuous and uninterrupted flower in interstate commerce.

41.     The Defendants' business activities that are the subject of this Complaint were within the flow of and substantially affected interstate trade and commerce.

42.     During the Class Period herein alleged, the Defendants' conduct and their co-conspirators' conduct occurred in, affected, and foreseeably restrained the interstate commerce of the United States, as well as commerce in each of the states.

## VII.    ALLEGATIONS OF WRONGDOING.

### A.     All Broker And Insurer Defendants Engaged In An Unlawful Use of Contingent Commission Arrangements.

43.     The practice of using contingent commission arrangements was widespread throughout the insurance industry and has been ongoing for years. The practice

was the product of an unlawful conspiracy.  Any single insurance broker could not continue to utilize these arrangements unless it knew and had the understanding that its competing brokers were likewise using them and that insurers were acquiescing in and cooperating with their use. Individual insurers likewise agreed to these arrangements with the knowledge and understanding that other competing insurers agreed to them as well.

44.     The practice reached its current state beginning in the mid 1990s, due to the efforts of William Gilman ("Gilman"), a Managing Director at Marsh and the Executive Marketing Director of Marsh Global Broking ("MGB").  According to an October 22, 2004 report in the *Wall Street Journal*, "Mr. Gilman helped to orchestrate the system at the heart of the scandal—channeling business to insurance companies that paid the biggest commissions to Marsh, rather than to insurers willing to provide the lowest quotes, according to more than two dozen current and past employees of Marsh and insurance firms."  In the early 1990s, in order to satisfy MMC's demand for greater profits, Marsh developed PSAs (later known as MSAs) that required insurers to pay Marsh fees based on volume of business alone.  This system gave the incentive to brokers like Marsh to direct clients to insurers that would not necessarily offer the best price.  AIG was one of the first insurers to accept this type of arrangement, and other insurers promptly followed suit.

45.     In order to maximize profits from PSAs, they were imposed on business throughout Marsh, and were centralized under MGB.  According to the *Wall Street Journal* article cited above, "[t]his unit directed the PSA fee plan and served as the clearinghouse of dealings between Marsh and its insurance clients in several practice areas, including midsize companies that buy property and casualty insurance."  Through MGB, hundreds of contracts were channeled to insurers who provided the most lucrative remuneration to Marsh. According to the same article, "Robert Newhouse, Marsh's former chairman of U.S. operations, said Global Broking's purpose was to maximize revenues and that all Marsh employees and field agents were to abide by the Global Broking system... "

46.     As this system was implemented, the pressure to produce more profits each year became unrelenting.  "'We had to do our very best to hit our numbers,' says Robert Amoroso, former manager of Marsh's Philadelphia branch. 'Each year, our goals were more aggressive.'"  Roger Egen, President and Chief Operating Officer of the Marsh brokerage unit has been quoted as telling his management team that "[e]ach time I see Jeff[ery Greenberg, CEO of MMC] I feel like I have a bull's eye on my forehead."

47.     This internal pressure for higher profits was pursued at the expense of Marsh's clients, who were deprived of fair price competition for insurance products.  As part of the effort to steer business to insurers who paid the most in PSA/MSA fees to Marsh, the fictitious "A, B, C" quotation system described below was utilized.  In the United States alone, Marsh has identified 61 insurers (including all of the Insurer Defendants herein) with whom it used MSAs.  It has conceded that it uses MSAs "with most of its principal insurance markets." It claims that MSAs "are commonplace in the industry and Marsh has them with almost all major insurers."

48.     None of these practices were fully and accurately described to clients; many (such as the use of rigged bids) were never disclosed at all, even though Marsh/MMC, like other brokers, had a fiduciary obligation to its clients.

49.     With the onset this year of the investigation by New York Attorney General ("A.G.") Elliott Spitzer ("Spitzer") into the use of contingent commission arrangements, Marsh did post a website (<http://www.msa.marsh.com>) to describe these agreements.  That website was itself misleading, however.  It did not disclose the use of bid-rigging or fictitious quotes for Insurance Products.  It did not disclose that the true purpose of MSAs was to steer clients to those insurers who paid Marsh the most money.  Moreover, the website asserts that MSAs compensate Marsh for services provided to insurers, allegedly including "streamlined access to clients," "intellectual capital," "product development," "development and provision of technology" and "administrative and information services." All of these "services," however, are services Marsh and MMC were already fiduciarily

obligated to provide to clients. Moreover, any assertion that MSAs/PSAs compensate Marsh and MMC for the costs of providing these services is bogus. A 2004 report by J.P. Morgan Securities, Inc. ("Morgan") states that the profit margin for brokers on revenues from MSAs/PSAs is at least 70% and may be as high as 100%. The report concluded that "[w]e are hard-pressed to describe any material cost directly associated with these revenues."

50.     Marsh and MMC also made no systematic effort to disaggregate the revenues from these agreements, something Jeffrey Greenberg, its former CEO, admitted as late as a conference with market analysts on July 28, 2004. Only on October 18, 2004, after being sued by Spitzer in the lawsuit described below, was it disclosed that MMC's revenues from contingent commission arrangements were $845 million in 2003 (12% of MMC's risk and insurance revenue and 7% of total consolidated revenue) and $420 million for the first six months of 2004 (11% of MMC's risk and insurance revenue and 7% of its total consolidated revenue).

51.     Thus, while Marsh and MMC portrayed themselves as "advocates" for their clients who acted in "our client's best interest", by virtue of the practices described herein, they repeatedly and consistently acted against the best interests of their clients in order to maximize their own profits through unfair and unlawful competitive acts.

52.     This type of conduct was not confined to Marsh and MMC, however.

53.     The New York A.G.'s office has confirmed that the practices complained of in its complaint against MMC and Marsh described below are widespread and extend throughout the insurance industry. In a press release issued by that office on October 14, 2004, it was stated:

> "[t]he actions against the brokerage firm, Marsh & McLennan Companies, and the two executives stem from a widening investigation of fraud and anti-competitive practices in the insurance industry. Evidence revealed in today's lawsuit also implicates other major insurance carriers.
>
> "'The insurance industry needs to take a long, hard look at itself,' Spitzer said. 'If the practices identified in our suit are as widespread as they appear to be, then the industry's fundamental business model needs major corrective action and reform.'

> ""There is simply no responsible argument for a system that rigs bids, stifles competition and cheats customers,' he added."

54.     In testimony given before the U.S. Senate's Governmental Affairs Committee on November 16, 2004, Spitzer further confirmed that "contingent commissions have affected practically every line of insurance business" including reinsurance.

55.     The 2004 Morgan report cited earlier likewise concluded that "contingent commissions comprise 5 percent of revenues and 15 percent of earnings for publicly traded brokers." In testimony given before the U.S. Senate's Governmental Affairs Committee on November 16, 2004, it was estimated that in 2003, industry-wide property/casualty contingent commissions totaled $4.2 billion.

56.     The *New York Times* reported on October 25, 2004 that a six-month probe of Aon uncovered "deceptive and coercive practices" and that the New York A.G.'s office may commence a civil lawsuit against Aon during the next few weeks, according to a source close to the inquiry. The article goes on to state:

> "At Aon, the person close to the case said, investigators have found documentation of brokers steering business to insurers that paid the company incentives ... They also found another anticompetitive practice known as tying, a kind of pay-to-play arrangement in which brokers threaten to curtail sales for an insurance company unless the insurer lets the broker also arrange its own coverage needs or reinsurance. Fees on reinsurance, which insurers buy to reduce their risk, can run into the tens of millions of dollars."

An October 31, 2004 *New York Times* article further indicated that Michael O'Halleran, Aon's President and head of its reinsurance unit, may have required insurers to buy reinsurance from that unit in exchange for placing their own coverage with Aon's customers.

57.     Aon has admitted the widespread use of what it called CSUs, identifying 82 insurers with whom it has such agreements, including many of the Insurer Defendants here. Aon, in response to the New York A.G.'s office's investigation, has posted a website on the topic (<http://www.aon.com/about/csu/default.asp>), but, like Marsh's website, it is misleading because it does not explain how CSUs are used to allocate customers to those

insurers who provide greater payments to Aon. Aon's website also falsely states that CSUs compensate it for the costs of services supplied to insurers.

58.    In an October 28, 2004 press release, Aon admitted that it had received payments of contingent commissions totaling $117 million for the nine months ended in September of 2004. It also admitted that it received an additional $91 million during the same period for "other compensation for services to underwriters." Aon announced on October 22, 2004 that it was ceasing to accept contingent commissions, an action brought about by the Spitzer lawsuit described below. It has not indicated any intention to cease accepting the "other compensation" described in its October 28 press release.

59.    Likewise, Gallagher, according to the 2004 Morgan report cited above, received $22 million in contingent commissions in 2002 and at least $24 million in contingent commissions in 2003. Gallagher does not disaggregate its earnings on such commissions in its financial statements and does not disclose fully and fairly such commissions to its clients. In its mission statement, Gallagher claims that it places the needs of its clients first, but these practices belie that claim.

60.    Similarly, Willis announced for the first time, on October 21, 2004, that it obtained an estimated total of $160 million in 2004 from the use, *inter alia*, of contingent commission agreements. It also announced its intention to cease accepting them as of the date. As the Morgan 2004 report noted, Willis, along with Aon and MMC, had a practice of not disclosing such arrangements. Indeed, the Morgan report noted that under its CEO, Joe Plumeri, Willis was attempting to aggressively pursue such arrangements with insurers.

B.    **The Investigations And Prosecutions By The State Attorneys General.**

61.    On October 14, 2004, Spitzer filed a lawsuit against MMC and Marsh in New York state court, alleging that "[s]ince at least the late 1990s, Marsh has designed and executed a business plan under which insurance companies have agreed to pay Marsh more than a billion dollars in so-called 'contingent commissions' to steer them business and shield

16

them from competition." One of the documents attached to Spitzer's complaint is a statement by Marsh indicating that "[a]ssignments of this type are commonplace in the industry and Marsh has them with almost all major insurers." As Spitzer's complaint further stated, "[t]he losers in all of this, of course, are Marsh's clients and the marketplace for insurance, which Marsh corrupted by distorting and elevating the price of insurance for every policy holder." Spitzer's complaint alleged, *inter alia*, violations of New York's laws prohibiting antitrust violations and fraudulent business practices.

62.     Spitzer's complaint provided extensive documentary materials obtained from Marsh and others that showed how this corrupt system worked. Among the ways in which it worked was bid-rigging, whereby Marsh would collude with insurance companies to have the latter submit false quotations, so that Marsh could steer the business for its customers to the insurance company that submitted the ostensibly "lowest" bid. The insurance companies identified in Spitzer's complaint that participated in such bid-rigging included ACE Ltd., Hartford, MARP, and AIG. Examples of such bid-rigging and customer allocation, drawn from Spitzer's complaint against Marsh and MMC and the documents described therein, are set forth in detail below.

63.     In announcing his lawsuit on October 14, Spitzer said that the New York A.G.'s office had been misled in its investigation "at the highest levels of the company".

64.     MMC has responded to the filing of this complaint by:

a.      promising, in a press release dated October 14, 2004, to conduct an "independent review" of the accusations against Marsh;

b.      having Jeffery W. Greenberg, its former Chairman and CEO, announce on October 15, 2004 that Ray Groves ("Groves"), Chairman and CEO of MMC, would be replaced by Michael Cherlasky ("Cherlasky"), formerly head of Marsh Kroll, MMC's risk consulting subsidiary;

17

c.   announcing, on October 15, 2004, that, pending the completion of the New York Attorney General's ("A.G.") investigation, it was suspending the use of MSAs;

d.   making public on October 18, 2004, for the first time, MMC's revenues from contingent commission agreements, as described above;

e.   Announcing on October 25, 2004, that Jeffrey Greenberg had abruptly resigned as Chairman and CEO of MMC and would be replaced by Cherlasky;

f.   Announcing on October 26, 2004, that it was instituting institutional reforms, including transparency to clients, and the permanent abolition of MSAs;

g.   According to a November 4, 2004 *Wall Street Journal* article, dismissing Gilman and three other Marsh executives—Edward McNenney, Gregory Doherty and Glenn Bosshardt. A fifth executive—Gilman's daughter, Samantha Gilman—has been suspended but is still in Marsh's employ.

h.   Announcing on November 8, 2004 that Roger E. Egan, President and Chief Operating Officer of Marsh, Christopher M. Treanor, Marsh's Chairman and Chief Executive Officer of Global Placement, and William L. Rossoff, Senior Vice-President and General Counsel of MMC, were resigning, thus confirming that the wrongdoing in Marsh and MMC was pervasive and occurred at the highest levels of both companies.

i.   Announcing on November 18, 2004 that five members of Marsh's Board of Directors—Mathis Cabiallavetta, Peter Coster, Groves, Charles A. Davis, and A.J.C. Smith—were stepping down so that the company could thereafter adhere to best corporate governance practices.

j.   Announcing on January 7, 2005 that a new position of "Chief Compliance Officer" would be created, to be filled by Senior Vice-President E. Scott Gilbert.

k.   Announcing on January 31, 2005 a settlement with the New York A.G.'s office that provides for (over the course of four years) $850 million in restitution to clients for MSA charges, even though this relief represents only a fraction of the illegal profits Marsh obtained on MSAs and does nothing to restore money unlawfully obtained from clients as a result of bid-rigging activities.

l.   Disseminating on January 31, 2005 an internal audit by the law firm of Davis, Polk & Wardwell which concluded that bid-rigging discussions took place "regularly," may well have extended to numerous lines of insurance brokered by Marsh, and that other various unlawful quotation practices were engaged in by Marsh and insurers.

65.   On October 25, 2004, the New York Department of Insurance ("NYDOI") issued a citation against Marsh, MMC, and various Marsh subsidiaries alleging a failure to disclose fully to clients the nature and extent of additional commission arrangements with insurers, acting against the best interests of clients, agreeing with insurers to obtain contingent commissions in exchange for placement of business, pressuring employees to steer business to insurers that paid the highest contingent commissions, and soliciting false bids from insurers.

66.   On February 6, 2005, the New York A.G.'s office announced that Robert Stearns ("Stearns"), a Vice-President at Marsh that worked on Plaintiff's account, pleaded guilty to criminal charges of fraud in connection with the rigging of bids for insurance business. AIG, ACE, Zurich were among the insurers identified in the felony plea that had participated in these activities.

19

67.     On February 15, 2005, the New York A.G.'s office announced that Joshua Bewlay ("Bewlay"), a former Marsh executive, pled guilty to a felony count of a scheme to defraud. According to an article in the February 15, 2005 *Wall Street Journal*, Bewlay admitted in court that "there was a 'protocol designed to deceive' Marsh's clients about the payments the firm quietly accepted from insurers." He further indicated that "bid-rigging was a common practice at Marsh." The article reported that under the "protocol," "clients who asked about contingent commissions usually were referred to a specific Marsh employee, who would say that they added up to 1% to 2% of their premium, when in fact they sometimes hit 10% to 15%, according to court documents."

68.     The lawsuit against MMC and Marsh was not the only action undertaken by the New York A.G.'s office. Spitzer also announced on October 14, 2004 that two employees of the Excess Casualty unit of American Home Assurance Company, a subsidiary of AIG that provides excess liability insurance to businesses, pled guilty to charges of bid-rigging in connection with their dealings with Marsh. In published reports on the internet, the two are identified as Karen Radke, a Senior Vice-President, and Jean-Baptiste Tateossian, a manager.

69.     On February 15, 2005, John Mohs, a manager in an excess casualty insurance underwriting unit subsidiary of AIG, pled guilty to a scheme to defraud in the first degree. On that same date, Carlos Coello ("Coello"), a former AIG underwriter from September of 2002 to September of 2004, pled guilty to a misdemeanor charge of a scheme to defraud. Coello admitted that he submitted fake bids at the direction of Marsh and AIG employees; his attorney was quoted (in the same Wall Street Journal article cited above) as saying that "[t]he practice was in place before Carlos got there."

70.     AIG's involvement in bid-rigging is consistent with its corporate philosophy. According to testimony before the U.S. Senate's Governmental Affairs Committee on November 16, 2004, during an industry conference held in late 2003, Maurice Greenberg,

its Chairman and CEO, said "[w]e absolutely need to hold the line on pricing and not give in to excessive competition."

71.     In addition, the New York A.G.'s office announced that Patricia Abrams ("Abrams"), an Assistant Vice-President at ACE Ltd., pled guilty to committing improper practices. It has been reported that between 2002 and 2004 she had conspired with Marsh to submit false bids to it.

72.     As a result of these prosecutions, AIG, through Maurice Greenberg, announced on October 15, 2004 that it has suspended, at least for the moment, the payment of incentive fees to insurance brokers. Similarly, on October 17, 2004, Evan Greenberg, ACE Ltd.'s President and CEO, announced that the use of PSAs was being discontinued.

73.     ACE further announced on November 4, 2004, that it was dismissing two employees—Abrams and Geoffrey Gregory, President of ACE Casualty Risk—for their involvement in improper activities relating to bids submitted to MGB. Three other employees who worked in ACE Casualty Risk on a team that did business with MGB were suspended.

74.     Also, on November 12, 2004, the *Wall Street Journal* reported that Hartford had fired two underwriters in its Los Angeles office for "not fully cooperating" with the investigation being conducted by the New York A.G.'s office.

75.     On November 12, 2004, the New York A.G.'s office filed a lawsuit against Universal Life Resources dba ULR, Universal Life Resources, Inc. dba ULR Insurance Services, Inc., Douglas P. Cox ("Cox") (President and CEO of ULR) and a company (Benefits Commerce) of which Cox is the sole shareholder. In his press release announcing the filing of this lawsuit, Spitzer stated that "[t]oday's case demonstrates that the corrupt practices first laid bare in the Marsh suit are present in additional sectors of the industry ... Secret payoffs and conflicts of interest that infected the market for property and casualty insurance have taken root in the employee benefits market as well." Further examples of bid-rigging and customer allocation, drawn from Spitzer's complaint against ULR, are set forth in detail below.

76.     Similarly on November 12, 2004, the NYDOI issued a citation against Cox and ULR alleging a failure to disclose fully to clients the nature and extent of additional commission arrangements with insurers, acting against the best interests of clients, agreeing with insurers to obtain contingent commissions in exchange for placement of business, pressuring employees to steer business to insurers that paid the highest contingent commissions, and soliciting false bids from insurers.

77.     The practices in question are not limited to MMC, Marsh, Hartford, AIG, ACE Ltd., ULR, and MARP.

78.     MetLife admitted publicly on October 15, 2004 that it had received initially a subpoena from the New York A.G.'s office "seeking information regarding certain compensation agreements between insurance brokers and MetLife." MetLife has since received a second subpoena broadening the scope of that inquiry. More recently, MetLife received two subpoenas, which included a set of interrogatories, seeking information regarding whether MetLife has provided or is aware of the provisions of 'fictitious' or 'inflated' bids." Subsequently, on October 19, 2004, MetLife stated publicly for the first time that it earned $25 million on contingent commission arrangements in 2003.

MetLife's unlawful conduct was further detailed in the New York A.G.'s office's November 12, 2004 complaint against ULR.

79.     Similarly, on October 15, 2004, NFP stated that it had

> "received a subpoena from the Office of the Attorney General of the State of New York seeking information regarding placement service agreements. Since the receipt of the initial subpoena, NFP has received two additional subpoenas from the Attorney General's office seeking information as to whether it requested any insurance companies to provide fictitious or inflated quotes to clients or it intentionally misrepresented quotes to clients."

NFP went on to indicate that

> "[t]o date, the Attorney General's investigation of NFP has focused on the activities of NFP's New York licensed property and casualty insurance brokers. The ultimate scope and outcome of the Attorney General's investigation cannot be determined at this time ...."

80.     Similarly, on October 19, 2004, UnumProvident announced that the New York A.G.'s office had served subpoenas upon it, seeking information as to both its use of contingent commission agreements and "information regarding its quoting process." UnumProvident's unlawful conduct was further detailed in the New York A.G.'s office's November 12, 2004 complaint against ULR.

81.     Likewise, on November 16, 2004, it was announced that two senior underwriters at ZNA's Specialty Excess Casualty Unit pled guilty to criminal charges of rigging bids for insurance in conjunction with MGB. The press release announcing this development stated that the two employees "admitted to following and executing the directions from a supposedly neutral broker to submit bids designed to lose, thus awarding the business to the designated 'winner.'" ZNA's involvement was also consistent with its corporate philosophy. According to testimony before the U.S. Senate's Governmental Affairs Committee on November 16, 2004, during the aforementioned industry conference held in late 2003, James Schiro, CEO of Zurich Financial Services, said to his counterparts at other insurers "[l]et's not get pulled into a soft market. We are not ready for a soft market and cannot afford one... Let's not get in a race for marketshare.... we need several more years of profitability." This theme was emphasized again and again by CEOs speaking at the meeting.

82.     Similarly, on October 25, 2004, St. Paul announced that it had received a subpoena from the New York A.G.'s office "relating to the conduct of business between insurance brokers and St. Paul Travelers and its subsidiaries."

83.     And Gallagher has been sued by the Village of Orland Hills in Illinois state court for its practices of exacting hidden contingent commissions from clients. Gallagher has admitted in a Form 10-K filed on February 9, 2004 that "Gallagher may also receive contingent commissions which are based on the estimated profit the underwriting insurance company earns and/or the overall volume of business placed by Gallagher in a given period of time. Occasionally, Gallagher shares commissions with other brokers who have participated with Gallagher in placing insurance or servicing insureds." Thus, Gallagher has publicly

conceded that it has horizontal agreements with other brokers to share contingent commissions. Gallagher announced on October 26, 2004 that it would not enter into any new volume- or profit-based contingent commission arrangements as of January 1, 2005. Gallagher disclosed that it obtained $39.5 million in contingent commissions in 2004, $32.6 million in 2003, and $25.2 million in 2002. Fifteen state attorneys general and state departments of insurance have commenced investigations against Gallagher for its contingent commission practices and/or possible bid-rigging.

84.    It has further been reported that Connecticut A.G. Richard Blumenthal is conducting his own investigation of the industry and is considering filing lawsuits of his own. On November 12, 2004 it was reported in the *Wall Street Journal* that the Connecticut A.G.'s office had issued subpoenas to 42 of the nation's largest insurers and insurance brokers requiring those firms to identify any instances of fake bids since the beginning of 1998. Hartford has also reported receiving a subpoena from the Florida A.G.'s office.  Similarly, on November 18, 2004, California's Department of Insurance initiated a lawsuit in state court under California's insurance laws against ULR, Cox, MetLife, UnumProvident and others for fraudulent practices as described herein.

**C.    The Practices of MMC, Marsh, AIG, ACE Ltd., MRPA, Hartford And Others Revealed In the New York A.G.'s Complaint Against Marsh and MMC.**

**1.    Marsh Steered Clients To Insurers Who Paid It Favorable Contingent Commissions.**

85.    In the late 1990s, Marsh began internally rating the insurance companies with whom it dealt based on how much they paid Marsh pursuant to their contingent commission agreements.  In February of 2002, a managing director of the Healthcare group of MGB (which, as noted above, oversaw policy placement decisions in Marsh's major business lines) provided nine of his colleagues with a list of the insurance companies that were paying Marsh pursuant to contingent commission agreements.  He cautioned, however, that "[s]ome

[contingent commission agreements] are better than others," and said that soon, Marsh would formally "tier" the insurance companies. He went on to state that "I will give you clear direction on who [we] are steering business to and who we are steering business from."

86.     A "tiering report" was later circulated to MGB executives, which listed insurance companies in tiers depending on how advantageous their agreed-upon contingent commissions were to Marsh. The instructions to the managers who received the list included a direction that they were to "monitor premium placements" to assure that Marsh obtained "maximum concentration with Tier A & B" insurance companies, those with contingent commission agreements most favorable to Marsh. In a September 2003 e-mail, an MGB executive was even more direct:  "We need to place our business in 2004 with those that have superior financials, broad coverage and pay us the most."

87.     Marsh executives have issued directions about specific companies as well.  For example, in April of 2001, an MGB managing director in the Excess Casualty group in New York wrote to the heads of regional centers, asking for "twenty accounts that you can move from an incumbent [insurance company]" to a company that had just extended its contingent commission agreement.  She warned, however, "You must make sure that you are not moving business from key [contingent commission companies]."  Carrying out this directive, she concluded, "could mean a fantastic increase in our revenue."

88.     The benefit of the steering system to the paying insurance companies was clear.  In July of 2000, an MGB executive wrote to four of her colleagues to discuss "BUSINESS DEVELOPMENT STRATEGIES" with a particular "preferred" insurance company that had signed a contingent commission agreement with Marsh.  In describing what Marsh had done for that company, she wrote, "[t]hey have gotten the 'lions [*sic*] share' of our Environmental business PLUS they get an unfair 'competitive advantage['] as our preferred [*sic*] [insurance company]."

89.     Marsh has been explicit with insurance companies about how contingent commission agreements more favorable to Marsh would result in Marsh selling more of their

policies.  For example, an MGB executive recounted in an e-mail dated November 7, 2003 about how he told the president of ACE USA that she could meet her firm's sales goals by agreeing to a larger contingent commission agreement:  "I made it clear that if ACE wants us to meet significant premium growth targets then ACE will have to pay 'above market' for such [a] stretch ..."  Marsh also threatened to "kill" the company if it did not "get to [the]right number" on the contingent commission agreement.

90.     Marsh has recognized and rewarded employees who "moved" clients to insurance companies with contingent commission agreements.  For example, in February of 2003, a Marsh Senior Vice-President in the MGB's Healthcare Group nominated a subordinate to become a Vice-President.  On the nomination form, under the heading "Financial Success," he noted that the nominee had increased Marsh's revenue "by moving" a renewing client to an insurance company with a contingent commission agreement.  He concluded, "[n]eighborhood Health Partnership Estimated Revenue - $390,000."  That nominee's 2002 performance review similarly noted that the nominee "was responsible for the renewal of a large HMO in Miami and was successful with placing of this account with a [contingent commission insurance company]—increased revenue from $120,000 to $360,000 (estimated)."  A 2003 self-appraisal form by that same nominee—now a Vice-President—stated that he "[r]enewed large account with [contingent commission insurance company] to demonstrate our willingness to continue our relationship.  Moved a number of accounts to [contingent commission agreement carriers] for the sole reason to demonstrate partnership."  Other employees were similarly praised in performance evaluations for increasing Marsh's contingent commission income from insurance companies "by achieving budgeted tiering goals".

91.     Conversely, Marsh employees have been criticized for bucking the system.  Initially, when Marsh began signing national contingent commission agreements, MGB not only negotiated all of the agreements, but also kept all of the revenue.  Many of Marsh's local and regional offices, which had previously had their own contingent commission agreements with insurance carriers, resented the loss of revenue to the central MGB office and

refused to have MGB pass on all of their placements. Eventually, MGB initiated a "revenue repatriation" program under which some of MGB's national contingent commissions were shared with local and regional offices. In June of 2003, the head of MGB's Excess Casualty group wrote to an employee in Marsh's Seattle office to chastise her for placing insurance directly with a carrier on behalf of a client, thus denying a contingent commission to MGB: "[t]he GB repatriation dollars are no small component of your office's budget. You have lowered that amount with this placement. You may want to consider this in the future."

92.     Marsh also has entered into contingent commission agreements that create incentives to favor the incumbent carrier when a policy came up for renewal. At the time of a renewal, Marsh's clients expect it to give unbiased advice on whether to stay with the incumbent or sign with a new carrier. Meanwhile, incumbent insurance companies have paid Marsh to recommend their own renewals. For example, a 2003 contingent commission agreement with AIG Risk Management, Inc. ("AIGRMI") provided Marsh with a bonus of 1% of all renewal premiums if its clients renewed with AIGRMI at a rate of 85% or higher. If the renewal rate was 90% or higher, Marsh received 2% of the renewal premium, and if the rate was 95% or higher, Marsh received 3%. Marsh even negotiated (though it ultimately did not enter into) a $1 million "no shopping" agreement whereby Marsh would have recommended to its top individual clients who had bought personal insurance policies from Chubb Insurance that they renew those policies.

### 2.     Examples of Marsh's Bid-Rigging Practices With Insurers.

93.     On many occasions, insurance companies colluded with Marsh to rig bids and submit false quotes to unwitting clients throughout the United States. The following are examples only and are not meant to be all-inclusive. All of the conduct described below was undertaken in furtherance of the conspiracy by the Insurance Broker Defendants and Insurer Defendants to allocate customers and utilize PSAs/MSAs on an industry-wide basis.

a.    **AIG.**

94.    Among AIG's lines is excess insurance that covers losses over and above the amounts covered by the insured's primary insurance policies.  Beginning in or around 2001 until at least the summer of 2004, MGB's Excess Casualty Group and AIG's American Home Excess Casualty Division (AIG's principal provider of commercial umbrella or excess liability and excess worker's compensations insurance) engaged in systematic bid manipulation.

95.    When AIG was the incumbent carrier and a policy was up for renewal, Marsh solicited what was called an "A Quote" from AIG, whereby Marsh provided AIG with a target premium and the policy terms for the quote.  If AIG agreed to quote the target provided by Marsh, AIG kept the business, regardless of whether it could have quoted more favorable terms or premium.

96.    In situations where another carrier was the incumbent, Marsh asked AIG for what was variously referred to as a "backup quote," "protective quote" or "B Quote," telling AIG that it would not get the business.  In many instances, Marsh provided AIG with a target premium and the policy terms for these quotes.  In these cases, it was understood that the target premium set by Marsh was higher than the quote provided by the incumbent, and that AIG should not bid below the Marsh-supplied target.  For example, in October of 2003, an underwriter at AIG described a particular quote that he had provided as follows:  "[t]his was not a real opportunity.  Incumbent Zurich did what they needed to do at renewal.  We were just there in case they defaulted.  Broker ... said Zurich came in around $750K & wanted us to quote around $900K."  Even when AIG could have quoted a premium lower than the target, it rarely did so.  Instead AIG provided a quote consistent with the target premium set by Marsh, thereby throwing the bid.

97.    In other instances, Marsh asked AIG to provide B Quotes where AIG was not supposed to get the business, but Marsh did not set a particular premium target.  In these instances, AIG looked at the expiring policy terms and premium and provided a quote high enough to ensure that:  (a) the quote would not prevail, and (b) in the rare case where

AIG did get the business, it would make a comfortable profit. One example was reflected in a communication by Stearns to a colleague, William McBurnie, where it was stated: "Chubb have quoted lead renewal at ...$135,000. Would you please have AIG provide a B." The same executive said in a related e-mail: "[a] 'B' would be a quote from AIG which is higher in premium and more restrictive in coverage, thus supporting the Chubb quote."

98.     In B Quote situations, AIG did not do a complete underwriting analysis. In those few situations when AIG inadvertently won B Quote business (because the incumbent was not able or willing to meet Marsh's target), AIG personnel would "back fill" the underwriting work on the file—that is, prepare the necessary analysis after the fact.

99.     Finally, Marsh came to AIG for a "C Quote" when there was no incumbent carrier to protect. Although Marsh often provided premium targets in these situations, it was understood that there was the possibility of real competition.

100.     On October 29, 2003, Stearns sent an informational e-mail to five of his colleagues at MGB, attaching a document that outlined some of the "very specific protocols on how we place business...." The document states; "[r]equest 'B' quotes early b/c last week of every month markets only focus on 'live' opportunities vs. quoting B's (careful that alternative 'B' doesn't beat incumbents quote—it's not always price, it could be attachment point or coverage)."

101.     The "A, B, C" quote system was strictly enforced by Marsh through Gilman, the Executive Director of Marketing at MGB mentioned earlier. Gilman refused to allow AIG to put in competitive quotes in B Quote situations, and, on more than one occasion, warned that AIG would lose its entire book of business with Marsh if it did not provide B Quotes. Gilman likewise advised AIG of the benefits of the system. As he put it, Marsh "protected AIG's ass" when it was the incumbent carrier, and it expected AIG to help Marsh "protect" other incumbents by providing B Quotes.

b.     **ACE.**

102.    ACE USA is part of a group of subsidiaries under ACE.  In 2002, ACE

USA decided to enter the excess casualty market by creating a separate division, called the

Casualty Risk Department.  ACE USA signed a contingent commission agreement in order to

gain access to the business Marsh controlled.  ACE USA also repeatedly provided the same

type of B Quotes that AIG provided.

103.    The B Quotes given to Marsh were often in amounts requested by

Marsh, even though a lower quote would have been justified by an underwriting analysis.  As

ACE USA's President of Casualty Risk summarized:

> "Marsh is consistently asking us to provide what they refer to as
> 'B' quotes for a risk.  They openly acknowledge we will not bind
> these 'B' quotes in the layers we are be [sic] asked to quote but
> that they will work us into the program' at another attachment
> point.  So for example if we are asked for a 'B' quote for a lead
> umbrella then they provide us with pricing targets for that 'B'
> quote.  It has been inferred that the 'pricing targets' provided are
> designed to ensure underwriters 'do not do anything stupid' as
> respects pricing."

In this same e-mail, ACE USA's executive wrote that he "support[ed]" Marsh's business

model, which he described as "unique."

104.    An example of the operation of this system is evident in the bidding for

the excess casualty insurance business of Fortune Brands, Inc., a holding company engaged in

the manufacture and sale of home products, office products, golf products, and distilled spirits

and wine.  On December 17, 2002, an ACE USA Assistant Vice-President of underwriting

sent a fax to Greg Doherty ("Doherty"), a Senior Vice-President in MGB's Excess Casualty

Division, quoting an annual premium of $990,000 for the policy.  Later that day, ACE USA

revised its bid upward to $1,100,000.  On the fax cover sheet with the revised bid, ACE

USA's Assistant Vice-President wrote:  "[p]er our conversation attached is revised

confirmation.  All terms & conditions remain unchanged."  In an e-mail the next day, the

Assistant Vice-President to an ACE USA Vice-President of Underwriting explained the

revision as follows:  "[o]riginal quote $990,000 ... We were more competitive than AIG in

price and terms. MMGB requested we increase premium to $1.1M to be less competitive, so AIG does not loose [*sic*] the business. ..."

105.    As another example, in a March 5, 2003 e-mail, Bewlay, head of MGB, directed Stearns to "get the quote from Pete. AIG was to hit 25 percent increase. Then we need B quotes at the expiring attachments." Further e-mails reflect that Zurich, ACE, and St. Paul subsequently offered losing quotations on the account. In one, Doherty sent ACE underwriter James Williams on March 17, 2003 an e-mail instructing him as follows: "need a 'B' for shits and giggles." The client renewed the insurance policy with AIG.

106.    This arrangement benefited both to Marsh and ACE USA. As Doherty wrote in a June 20, 2003 e-mail to the same ACE Vice-President: "Currently, we have about $6M in new business [with ACE USA] which is the best in Marsh Global Broking so I do not want to hear that you are not doing 'B' quotes or we will not bind anything."

107.    The bidding process for excess casualty insurance for Brambles, USA, a manufacturer of commercial industrial pallets and containers (among other products), further demonstrates the bid-rigging scheme. In June of 2003, ACE USA learned that Brambles was unhappy with the incumbent carrier. Despite this, Marsh asked ACE USA to refrain from submitting a competitive bid because Marsh wanted the incumbent, AIG, to keep the business. An ACE USA Vice-President of Underwriting wrote to the ACE USA President of Risk and Casualty:

> "Our rating has a risk at $890,000 and I advised MMGB NY that
> we could get to $850,000 if needed. Doherty gave me a song &
> dance that game plan is for AIG at $850,000 and to not commit
> our ability in writing."

108.    ACE USA continued to provide Marsh with inflated quotes in 2004.

**c.    Hartford.**

109.    Marsh also engaged in bid-rigging conduct with Hartford with respect to Marsh's "Middle Market" and small business clients.

110.   Middle Market insurance provides coverage for companies where the annual premium ranges from tens of thousands of dollars to around $1 million. Hartford became a "partner market"—meaning it agreed to pay contingent commissions—with Marsh's so-called Advantage America program in July of 2003. The Advantage America program was developed by Marsh to fold its small commercial property/casualty business into its Middle Market group. With annual premiums in the range of $25,000 to $200,000 dollars, this program provided coverage to small businesses. Marsh centralized all of this small business insurance placement in an office in Lake Mary, Florida, near Tampa.

111.   Hartford was given the advantage of office space in Marsh's Lake Mary facilities. On numerous occasions during 2003 and 2004, Marsh employees asked the two Hartford underwriters assigned to this facility, either in person or by telephone, to provide an inflated quote or "indication" (non-binding proposed price) for insurance coverage for a small business. Typically, Hartford's underwriters were told to price the quote or indication 25% above a particular number, and that by doing so Hartford need not worry that it would get the business. Hartford colluded in the scheme.

112.   Marsh did not restrict its bid rigging in the Middle Market to small businesses. Marsh's Los Angeles area MGB office handled larger Middle Market risks with annual premiums reaching $1 million. The Marsh Los Angeles office is in the same office building as Hartford's. Starting as far back as 2000, Marsh employees, on virtually a daily basis, asked Hartford for inflated quotes or indications in a manner similar to the process described above for the Florida facility. In Los Angeles, however, Marsh often provided Hartford with a spreadsheet showing the accounts for which it wanted Hartford to provide a losing quote or indication, along with other insurers' quotes. It instructed Hartford to quote some percentage, typically 25%, above the other insurers' quotes on the spreadsheet to ensure that Hartford would not get the business. These were referred to as "Throwaway Quotes." Hartford provided the inflated quotes.

32

113.    On even larger risks in Southern California, those of over $1 million of annual premium, Marsh similarly asked for inflated quotes or indications, also providing spreadsheets containing other insurers' quotes to Hartford. Hartford provided these quotes as well. Hartford provided these quotes and indications because Marsh was its biggest broker, and it felt that Marsh would limit its business opportunities if it refused.

### d.    MARP.

114.    As of 2001, MARP had entered into separate contingent commission agreements with Marsh's Excess Casualty, Property, FINPRO (Financial Products) and Health Spectrum Groups. MARP adjusted its rates to pass the costs of these agreements on to its clients. When pricing Marsh business, MARP determined the base premium for the policy, added a percentage to reflect the expected contingent commission and sent the quote to Marsh.

115.    In 2000, MARP disclosed the existence of its contingent commission agreement with Marsh to a significant client to explain the contingent commissions that were being passed on to the client. Marsh was furious, and chastised Munich. A Senior Vice-President at MARP apologized to Marsh in an e-mail: "[w]e acknowledge that this was inappropriate behavior ..." He told Marsh that MARP would "do the necessary to eliminate all documentation, electronic or otherwise, that references or otherwise alludes to the [contingent commissions]. I apologize for the consternation that this has caused within the Marsh organization."

116.    Throughout 2001 and early 2002, the MGB Excess Casualty Group repeatedly requested that MARP provide "favors" designed to assist Marsh in its bid rigging process. These "favors" included:

  a.    Requests to submit "false quotes" to allow Marsh to manipulate market pricing and present other carriers' quotes in a more favorable light;

  b.    A request on a particular account that MARP either decline the risk altogether or submit a quote higher than the incumbent quote;

        c.      Requests that MARP not bid on a renewal because Marsh owed the incumbent a favor and didn't want Munich to come in with a lower quote; and

        d.      A request for an artificially inflated initial quote so that Marsh could look good to the client when it "negotiated" the quote down.

117.    Throughout 2001, Marsh also asked MARP to act as "back-up or wait in the wings" at several client presentations. It was, in other words, asking MARP to attend presentations for prospective clients with whom Munich was already out of the running. One Munich regional manager characterized these presentations as mere "Drive bys." For example, in 2001, Marsh sent MARP an e-mail request explaining that it "needed to introduce competition" at a prospective client presentation and needed Munich to send a "live body." Frustrated with Marsh's continuous requests for "live bodies," one MARP regional manager responded, "WE DON'T HAVE THE STAFF TO ATTEND MEETINGS JUST FOR THE SAKE OF BEING A 'BODY.' WHILE YOU MAY NEED 'A LIVE BODY", WE NEED A 'LIVE OPPORTUNITY.'"

118.    These business practices were known to MARP's management. In preparing for an April 2001 meeting with Marsh, a Senior Vice-President solicited reactions from his regional managers regarding their experiences with Marsh Global Broking. He then cut and pasted the managers' comments into a single document and circulated it to them for discussion. Complaints and reactions from the MARP's regional managers included:

> "I am not some Goody Two Shoes who believes that truth is absolute but I do feel I have a pretty strict ethical code about being truthful and honest with people. And when I told [sic] I have to say certain things I know to be untrue to people I respect and have known for a long time, it is not what I feel I should be asked to do of [sic] what this company stands for. Yet it has already happened several times and I have either had to dodge the client and broker on the issue, which won't always work, or risk making GB [MGB] angry by telling a carefully edited version of the truth, which was more than they wanted out but less than satisfying to the client or broker.

> "This idea of 'throwing the quote' by quoting artificially high numbers in some predetermined arrangement for us to lose is

repugnant to me, not so much because I hate to lose, but because
it is basically dishonest. And I basically agree with the comments
of others that it comes awfully close to collusion or price fixing.

"WHAT ARE THE RULES ON PRICING—ARE WE TO
QUOTE OUR NUMBERS OR WHAT MGB [MARSH
GLOBAL BROKING] WANTS US TO QUOTE—HOW DOES
THEIR INTERNAL PREFERRED MARKET THING WORK?"

### e.    Zurich

119.    Zurich also provided fictitious quotations to Marsh. For example, in a

March 11, 2003 e-mail to April Greenwood ("Greenwood"), a Marsh broker, Stearns

said: "[c]an you get me a B from Zurich. Client will be binding with [incumbent] St. Paul at

$270,000 all coverages as expiring. $325,000 should work." Later that day, in another e-mail,

the same executive reiterated his request to Greenwood to "have them issue a B on the lead at

$325,000 or more." The next day, an underwriter at Zurich provided a $360,000 quotation to

Marsh.

### f.    The Greenville County School Project.

120.    Marsh's involvement with the Greenville, South Carolina Public School

District illustrates how Marsh both abused its fiduciary role in an attempt to secure a

contingent commission agreement with an insurance company and rigged the bidding process.

121.    In the 1990's, Greenville County, South Carolina experienced

unanticipated student growth beyond the capacity of then existing facilities for the 62,000

school children in the district. In addition, many of the existing schools needed extensive

renovations. The school district, through a non-profit corporation named BEST (Building

Equity Sooner for Tomorrow), raised $800 million by selling bonds to fund the renovation,

expansion, and new construction of fifty-five school facilities (the "Greenville project").

BEST hired Institutional Resources, LLC ("Institutional Resources") as the program manager

and procurement agent for the project. As part of its responsibilities, Institutional Resources

had to procure insurance coverage for the project.

122.     Lacking expertise in insurance, Institutional Resources hired Marsh after conducting a search and evaluating broker proposals.  For its role in the Greenville project, Marsh was to be paid approximately $1.5 million.

123.     During the bidding process, there were two serious bidders who competed for the business: Zurich North America ("Zurich") and ACE USA.  Unbeknownst to Greenville, however, while this bidding process was ongoing, Marsh held out the Greenville project as a "carrot" in its effort to entice Zurich to sign a contingent commission agreement.  In a December 12, 2002 email, Joan Schneider ("Schneider"), an MGB executive, explained to Zurich:

> "[Y]ou are currently in the running on Greenville Country [sic] School System (FIX cost near 3MM) ... neck and neck with ACE who we have a PSA with ... Will bind most likely after the first of the year ... where are we on the [contingent commission] agreement ... Left messages but haven't heard from you ... hint hint."

124.     Between the December 12, 2002 email and the award of the contract on January 3, 2003, the contingent commission negotiations progressed and the project was awarded to Zurich.  Although Zurich and Marsh never entered a contingent commission agreement, Marsh made clear its view of the linkage:

> "[p]er our conversation today, (sorry to call you during your vacation) the good news is that we are binding Greenville County School with you today!!!!!!  We worked hard to get this to you and as we discussed expect it to be part of the [contingent commission] agreement.  On your return Monday, I hope you and your regional folks can get this ironed out ... this is a great start to the New Year and would like to keep it going."

125.     As part of its vigorous effort to steer the Greenville contract to Zurich, Marsh sought a false bid from a competing insurer and then, despite that insurer's refusal, submitted a wholly fictitious bid on that insurer's behalf.  On December 16, 2002, Glenn R. Bosshardt ("Bosshardt"), the MGB vice-president assigned to the project and Schneider's subordinate, contacted an assistant vice-president of underwriting at CNA, an individual with

whom he had previously worked and who had already told Bosshardt that CNA had no interest in bidding on the Greenville project. In an e-mail, Bosshardt stated:

> "[P]er my voicemail, we need to show a CNA proposal. I will outline below the leading programs (ACE & Zurich). I want to present a CNA program that is reasonably competitive, but will not be a winner."

Bosshardt proceeded to reveal the ACE and Zurich quotes on the project and then proposed numbers that CNA should quote in order to lose the bid but still appear to have been competitive. Although CNA never authorized Marsh to submit this bid, it was submitted to Institutional Resources as a legitimate competing bid.

126. Notably, Marsh—at a time when the prospect for a contingent commission agreement with Zurich remained real—advised Institutional Resources that Zurich was a superior company and should be awarded the bid. Marsh did not disclose to Institutional Resources either that it was seeking a contingent commission agreement from Zurich, or that it had falsely submitted a bid under CNA's name. Institutional Resources followed Marsh's recommendation and awarded the project to Zurich.

127. Even though Zurich and Marsh never entered into the [contingent commission] agreement, in his 2003 performance review, Bosshardt was praised for having "assist[ed] in the implementation of MGB's excess liability strategy to maximize contingent commission revenue."

## D. The Practices of ULR, UnumProvident, Prudential, MetLife, And Others Revealed In the New York A.G.'s Complaint Against ULR.

### 1. ULR Enters Into Lucrative Side Arrangements With Insurers.

### a. ULR Receives Undisclosed Override Payments.

128. ULR has entered into secret override payment arrangements that have created potential and actual conflicts with the interests of its clients. The arrangements create extraordinary incentives for ULR to drive business to particular insurers: if a single ULR

client moves from one insurer to another, ULR could lose millions of dollars in compensation. For example, under ULR's 2003 "special producer agreement" with UnumProvident, ULR would obtain "[e]xtra [c]ompensation" only if, among other things, it maintained 90 percent of the book of business it had the previous year with UnumProvident. ULR's persistency rate for the year was 91.48 percent. Had it dropped a mere 1.5 percent, ULR would have lost its entire annual override payment for persistency from UnumProvident in the amount of $1.27 million.

129.   The incentives are equally compelling for the insurers. It is understood that ULR will only direct business to insurers if they participate in override arrangements. In the words of a UnumProvident underwriter: "[u]nfortunately, to play with [ULR], we need the over-rides." As another UnumProvident employee elaborated, UnumProvident enters into override agreements with ULR because it represents one of the "biggest premium opportunities" and UnumProvident would get "0" of that business if it did not join ULR's club.

130.   Given this perception, MetLife, the nation's largest life insurer, paid ULR $9 million, or over 36 percent of its $25 million override budget in 2003—a remarkable figure given that Met had override agreements with at least 60 brokers.

131.   ULR's clients, however, never know that the placement or renewal of their employees' insurance coverage might mean the difference between a substantial payday for ULR or no payday at all. To the extent ULR even mentions overrides to its clients, it fails to meaningfully disclose the substance of the agreements, or how ULR generates substantial income from them. ULR has never explained to clients how overrides and other undisclosed payments might influence its professional advice so that clients could make informed decisions about their interaction with ULR.

132.   On the rare occasions that ULR has made disclosures, such disclosures have been misleading. For example, in a March 2004 agreement for consulting services with Sun Healthcare Group, Inc. ULR disclosed that it could receive an override payment, but the

agreement does not explain that ULR's receipt of override payments are based on whether business is placed with a particular carrier. Furthermore, ULR incorrectly states that its compensation will not exceed one percent of premium, when in fact, ULR's agreements allow for greater compensation.

**b.   ULR Receives "Communication Fees" From Unsuspecting Employees.**

133.   In addition to receiving undisclosed payments from overrides, starting at least as early as 1998, ULR devised ways to generate additional revenues: it began charging fees for vague and ill-defined services. For example, ULR began charging fees such as "RFP fees," "enrollment fees" and "finder's fees," among others. While the RFP fee is a one time fee that the insurer pays during the RFP preparation process, the other fees remained undefined and were demanded on an ad hoc basis. ULR's receipt of these fees remained largely undisclosed to the clients and often lacked documentation of the services rendered. As one UnumProvident executive noted,

> "In the past year, we have paid Doug Cox/ULR several million dollars and we don't have a lot of formal documentation other than email messages & invoices."

134.   A Prudential executive likewise questioned: "I can't believe that we would pay anybody $513,000 … on a handshake."

135.   In or about 1999, ULR began to aggressively promote its "communication services," specifically the "writing, designing and printing" of informational material about benefits plans. The fees for this service and the distribution of such materials to plan participants were typically charged at the rate of $10 per employee and $5 per employee for supplemental life and disability benefits, respectively.

136.   The communication fees have become highly lucrative for ULR. In 2003, the $5.6 million ULR received for "communication" services represented over 20 percent of its total revenues for the year.